IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-02536-PAB-MEH

ELAINE CALDERON,

      Plaintiff,

v.

SAFEHOUSE PROGRESSIVE ALLIANCE FOR NONVIOLENCE and
ANNE TAPP, Executive Director, Safehouse Progressive Alliance for Nonviolence,

      Defendants.

---

## ORDER

---

    This matter is before the Court on the motion for summary judgment [Docket No. 108] filed by defendants Safehouse Progressive Alliance for Nonviolence ("SPAN") and Anne Tapp, SPAN's executive director on October 29, 2012.  Plaintiff Elaine Calderon, a former SPAN employee, alleges that she was terminated on the basis of race and retaliated against for opposing discrimination in violation of 42 U.S.C. § 1981.

## I. BACKGROUND

    The following facts are undisputed unless otherwise indicated.  SPAN is a non-profit human rights organization committed to ending violence against women.  Docket No. 108 at 2, ¶ 1; Docket No. 122 at 2, ¶ 1.  Ms. Tapp began working at SPAN in 1991 and has served as the Executive Director since October 1997.  Docket No. 108 at 2, ¶ 2; Docket No. 122 at 3, ¶¶ 2-4.  As the Executive Director, Ms. Tapp is the only individual at SPAN with the authority to hire or fire employees.  *Id*.  During her tenure as Executive Director, Ms. Tapp increased SPAN's hiring of Latinas and other minorities

and by 2004, one half of SPAN's staff members were minorities.  Docket No. 108 at 4,
¶ 15; Docket No. 122 at 4, ¶¶ 14-15.

In 1995, SPAN hired plaintiff's daughter, Lisa Calderon, who is African- and
Mexican-American.  Docket No. 108 at 2, ¶ 3; Docket No. 122 at 3, ¶¶ 2-4.  Lisa
Calderon left SPAN in 1999 to attend law school, but returned later that year and was
promoted by Ms. Tapp to Legal and Social Policy Director.  Docket No. 108 at 2, ¶¶ 4-6;
Docket No. 122 at 3, ¶¶ 2-4, 6-7.  In that position, Lisa Calderon organized national,
state-wide, and community training sessions on anti-racism and social justice issues.
Docket No. 108 at 3, ¶ 7; Docket No. 122 at 3, ¶¶ 6-7.  All of SPAN's directors,
including Ms. Tapp, participated in organizing and conducting these training sessions.
Docket No. 108 at 3, ¶ 8; Docket No. 122 at 3, ¶ 8.  Lisa Calderon also trained
volunteers at SPAN's domestic violence shelter on anti-racism and social justice issues.
Docket No. 108 at 3, ¶ 9; Docket No. 122 at 3, ¶ 9.

In 2000 or 2001, Lisa Calderon wrote a memo describing differences in
treatment received by African-American women and non-African-American women at
SPAN's shelter.  Docket No. 108 at 3, ¶ 12; Docket No. 122 at 3, ¶ 12.  Ms. Tapp
placed Lisa Calderon in the interim role of Director of SPAN's shelter to address these
concerns.  *Id*.  In December 2006, Ms. Tapp asked Lisa Calderon to consider
succeeding her as Executive Director.  Docket No. 108 at 7, ¶ 30; Docket No. 122 at 8,
¶ 30.  Lisa Calderon decided she was not interested in the position.  *Id*.  Lisa Calderon
believed that she had a good relationship with Ms. Tapp until 2007.  *Id*.

In 2000, SPAN hired plaintiff to work in its shelter.  Docket No. 108 at 3, ¶ 10;
Docket No. 122 at 3, ¶ 10.  Plaintiff is of Mexican-American descent.  *Id*.  In May 2001,

2

plaintiff was promoted to the position of Full Time Overnight Advocate at the shelter.

Docket No. 108 at 3, ¶ 11; Docket No. 122 at 3, ¶ 11.  In August 2002, plaintiff was

promoted to the position of Transitional Services Women's Advocate ("TSWA").  Docket

No. 108 at 3, ¶ 13; Docket No. 122 at 3-4, ¶ 13.  As a TSWA, plaintiff was charged with

maintaining the waiting list for housing at two separate properties and providing case

management to SPAN clients who had moved into those properties, including building

skills needed to live independently.  Docket No. 108 at 4, ¶ 18; Docket No. 122 at 5,

¶ 18.  In June 2003, plaintiff began reporting to Tsunemi Rooney, the Counseling

Program Director.  Docket No. 108 at 5, ¶ 20; Docket No. 122 at 6, ¶ 20.  In 2006,

plaintiff was transferred back to the shelter to work as a Shelter Family Advocate

reporting to Yolanda Arredondo, the Shelter Program Director.[1]  Docket No. 108 at 6,

¶ 28; Docket No. 122 at 8, ¶ 28.

The parties dispute the role that Ms. Tapp played in hiring and promoting

plaintiff, although there is no dispute that, from 1997 on, only Ms. Tapp had the

authority to make the final decision to hire or fire any employee.  Docket No. 108 at 2,

3, ¶¶ 2, 10, 11, 13; Docket No. 122 at ¶¶ 3-4, 10, 11, 13.  Defendants assert that

plaintiff performed poorly in the role of TSWA, prompting complaints from clients and

community members, and that plaintiff's poor performance was the reason she was

transferred back to the shelter.  Docket No. 108 at 4-7, ¶¶ 17, 19, 21-27, 29.  Plaintiff

disputes this characterization of her performance, arguing that she was a good

---

[1] Ms. Tapp had hired Ms. Arredondo, who is Mexican-American, in 2000 and promoted her in 2003 to the position of Shelter Program Director.  Docket No. 108 at 4, ¶ 14; Docket No. 122 at 4, ¶¶ 14-15.

employee, that the cited complaints are inadmissible, and that she was transferred back to the shelter because her experience was required there.  Docket No. 122 at 4-8, ¶¶ 17, 19, 21-27, 29.

In 2005, SPAN conducted a program audit.  Docket No. 108-19.  The audit stated that the TSWA, which was plaintiff's role at the time, was "[v]ery attentive to details"; was "[r]esponsive" but provided "inconsistent customer services"; was "[r]eaching fewer women despite increased housing resources"; was using an "[o]utdated model"; was "[n]ot keeping pace with need"; and lacked "innovation/creative solutions to increase effectiveness."  Docket No. 108-19 at 7.  Other programs received similar comments.  *See, e.g.*, Docket No. 108-19 at 1, 6, 7.

In 2006, SPAN hired a consultant to assess the feasibility of conducting a fundraising campaign for a new shelter.  Docket No. 108 at 8, ¶ 35; Docket No. 122 at 9, ¶ 35.  The study revealed that some potential donors had complaints related to SPAN's anti-racism work.  *Id.*; Docket No. 108-23 at 5 ("For [other community members], there remain conflicts around SPAN's work on racism and a style that is seen as 'aggressive.' . . . 'Some have a lot of admiration and respect for their aggressive work on addressing oppressions.  Some have been offended by their style, and call them angry women.'").  Ms. Tapp subsequently informed the directors and staff that SPAN needed a new approach to conducting its anti-racism and social justice work.  Docket No. 108 at 8-9, ¶ 36; Docket No. 122 at 9-10, ¶ 36.  Plaintiff alleges, and defendants deny, that Ms. Tapp responded to the survey by targeting African-American and Mexican-American employees for criticism, blame, and forced resignation.  Docket No. 122 at 9-10, ¶ 36; Docket No. 126 at 5, ¶ 36.

4

In June 2007, Lisa Calderon resigned from SPAN.  Docket No. 108 at 9, ¶ 37; Docket No. 122 at 10, ¶ 37; *see* Docket No. 108-24.  Plaintiff was upset and saddened by the circumstances surrounding her daughter's departure from SPAN and was concerned about the new direction that SPAN's anti-racism work would take.  Docket No. 108 at 10, ¶ 38; Docket No. 122 at 10, ¶ 38.  Defendants assert, and plaintiff disputes, that, following Lisa Calderon's departure, plaintiff's performance declined further and plaintiff became unduly confrontational in her interactions with other SPAN employees.  Docket No. 108 at 10-11, ¶¶ 38-44; Docket No. 122 at 10-13, ¶¶ 38-44.  Ms. Rooney's notes indicate that, in late September 2007, Ms. Rooney realized that plaintiff's personnel file was no longer in the office drawer where she had been keeping it.  Docket No. 108-12 at 2.  There is no indication in the record that the file has since been located and no description of what documents it contained.

At the end of June 2007, plaintiff began to search for another job.  Docket No. 108 at 11-12, ¶ 45; Docket No. 122-5 at 8 (Calderon dep., at 241, ll.5-9).  On September 11, 2007, Ms. Arredondo met with plaintiff and they discussed a possible end date of October 4, 2007.  Docket No. 108 at 12, ¶ 48; Docket No. 122 at 14, ¶ 48.  On September 12, 2007, plaintiff called an attorney who was on the SPAN board and left a message complaining that she was being discriminated against.  Docket No. 108 at 12-13, ¶ 49; Docket No. 122 at 15, ¶ 49.  The attorney believed the call to be confidential and did not discuss it with anyone at SPAN.  *Id*.

On September 13, 2007, Ms. Tapp met with Ms. Arredondo.  Docket No. 122 at 14-15, ¶ 48(c); Docket No. 126 at 7, ¶¶ 48-53.  Ms. Arredondo's notes from the meeting contain contradictory statements that Ms. Tapp allegedly told Ms. Arredondo to convey

5

to plaintiff, such as "I have no intention to fire you," "Need to plan for an open position," "You're not resigning so I'm assuming you will stay and for the long haul," "No grounds to fire you but are you asking me to fire you and why?," "Schedule a performance review with her," "What would make sense in a transition?," "Would it work for you to stay through October?," and "Clarity about leaving."  Docket No. 108-39 at 2-3.  Ms. Tapp's notes regarding her September 13, 2007 meeting with Ms. Arredondo state that she instructed Ms. Arredondo to determine whether plaintiff's intention was to leave or stay at SPAN, that if she intended to leave then a transition plan had to be created, and that if she intended to stay, Ms. Arredondo would have to work with plaintiff on performance problems.  Docket No. 108-37 at 3 ("as long as Elaine was willing to address the behavior and performance problems, I did not have any concern with her changing her mind about leaving").

On September 25, 2007, Ms. Arredondo called plaintiff and told her that October 4, 2007 would be her last day of work at SPAN.  Docket No. 108 at 13, ¶ 52; Docket No. 122 at 16, ¶ 52.  On September 26, 2007, plaintiff read a statement at a SPAN staff meeting, in which she stated: "I, Elaine Calderon, have been asked to leave by October 4, 2007.  I feel this is a discriminatory and retaliatory action to fire me by Anne Tapp. . . . I have been given notice by my Supervisor, Yolanda Arredondo, Shelter Program Director, that my last day is October 4, 2007."  Docket No. 108 at 14, ¶ 54; Docket No. 122 at 16, ¶ 54.  Plaintiff testified at a deposition on July 19, 2012 that, on September 26, 2007, she believed her termination was "absolutely final."  Docket No. 108-6 at 32 (Calderon dep., at 176, ll.14-24).

Ms. Arredondo testified that, after plaintiff left the September 26, 2007 staff

meeting, "[t]here was contradictory information about . . . whether or not Elaine was fired." Docket No. 122-9 at 4 (Arredondo dep., at 272, ll.17-24). Ms. Arredondo's notes from that meeting indicate that one of "Anne's responses" was that "Elaine was not fired." Docket No. 122-21 at 2. Ms. Arredondo testified that she had a number of conversations with Ms. Tapp regarding plaintiff's employment status between the September 26, 2007 staff meeting and October 4, 2007. She stated that, even after September 26, 2007, "the issue about October 4th being the end date was still somewhat unclear because there were comments about [plaintiff] not being fired, about did [Anne] want me to fire [plaintiff], did [plaintiff] want me to fire her, what made sense in a transition plan." Docket No. 122-9 at 8 (Arredondo dep., at 286, ll.13-18).

Ms. Arredondo stated that she could not recall whether she told plaintiff that Ms. Tapp announced at the September 26, 2007 staff meeting that plaintiff was not fired. *Id*. at 6 (Arredondo dep., at 279, l.24-280, l.2). Plaintiff testified at her deposition that

> I believed [on September 26, 2007] that my end date was October 4th, and yet it changed that night when I heard from Yolanda, and then I heard from Lisa that Yolanda said Anne Tapp said I wasn't fired. And so, to me, it was, again, another date change as there were three or four dates that had changed before.

Docket No. 122-5 at 18 (Calderon dep., at 343, ll.7-13). On October 4, 2007, plaintiff submitted a Notice of Employee Separation stating that she was resigning, effective that day. Docket No. 108-50 at 2.

On September 28, 2011, plaintiff brought this action against SPAN and Ms. Tapp. Docket No. 1. Plaintiff alleges that defendants discriminated against her on the basis of her race and national origin and retaliated against her for opposing unlawful discrimination in violation of 42 U.S.C. § 1981. Docket No. 133 at 2, ¶ 3(a). Plaintiff

seeks a declaration that defendants violated federal law and an award of economic and emotional damages, attorney's fees, and costs.  Docket No. 99 at 12-13, ¶ A. Defendants have moved for summary judgment on plaintiff's claims for discriminatory termination and for retaliation.  Docket No. 108.

## II.  STANDARD OF REVIEW

According to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  In pursuing summary judgment, the moving party generally bears the initial burden of showing the absence of a genuine dispute concerning a material fact in the case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  However, "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001).

"Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works of Colorado, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* FED. R. CIV. P. 56(e).  "To avoid

8

summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. However, to be clear, "it is not the party opposing summary judgment that has the burden of justifying its claim; the movant must establish the lack of merit." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1110 (10th Cir. 2009).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248). "A mere scintilla of evidence will not suffice to allow a nonmoving party to survive summary judgment." *Smith v. Rail Link, Inc.*, 697 F.3d 1304, 1309 n.2 (10th Cir. 2012).

"Hearsay testimony that would not be admissible at trial is not sufficient to defeat a motion for summary judgment." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1313-14 (10th Cir. 2005). "To be sure, the nonmoving party need not produce evidence 'in a *form* that would be admissible at trial,' but the content or substance of the evidence must be admissible." *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995) (quoting *Celotex*, 477 U.S. at 324). Thus, affidavits containing a third party's description of a declarant's supposed statements is not competent evidence on summary judgment. *Id*.

### III.  DISCUSSION

#### A.  Statute of Limitations

Defendants argue that plaintiff's claims are time-barred because (a) the statute

of limitations began to run on September 26, 2007, when plaintiff announced her

departure at the staff meeting, and (b) plaintiff did not file her complaint until September

28, 2011, two days after the four-year statute of limitations expired.  Docket No. 108 at

17-20.  Plaintiff counters that the statute of limitations did not begin running until her last

day of work on October 4, 2007.  Docket No. 122 at 20-23.

Wrongful termination and retaliation claims asserted under 42 U.S.C. § 1981 are

subject to a four-year statute of limitations.  *Cross v. The Home Depot*, 390 F.3d 1283,

1288 (10th Cir. 2004) (citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 381-82

(2004)).  The limitations period begins to run when the plaintiff first knows–or should

know–of her injury, whether or not she realizes its cause may be unlawful, *Almond v.*

*Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1176 (10th Cir. 2011), and whether or not

she subsequently receives severance benefits.  *Gray v. Phillips Petroleum Co.*, 858

F.2d 610, 613 (10th Cir. 1988).  Under this rule, a claim accrues when the challenged

practice is announced to the plaintiff.  *Almond*, 665 F.3d at 1177.  "[T]he proper focus is

on the time that the employee has notice of the *discriminatory acts*, not the time at

which the *consequences* of the acts became most painful."  *Id*. (internal citations

omitted) (emphasis in original).

Once the clock has started running, however, it may be equitably tolled when

"an employee's failure to timely file results from either a deliberate design by the

employer or actions that the employer should unmistakably have understood would cause the employee to delay filing [her] charge." *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994) (quoting *Olson v. Mobil Oil Corp.*, 904 F.2d 198, 201 (4th Cir. 1990)) (internal quotation marks omitted).  This includes instances where an employee has been "lulled into inaction by her past employer," "actively misled," or prevented "in some extraordinary way" from asserting her rights.  *Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002).  For example, in *Donovan v. Hahner, Foreman & Harness, Inc.*, 736 F.2d 1421, 1427 (10th Cir. 1984), the Tenth Circuit upheld a decision equitably tolling the statute of limitations because plaintiff's employer had deliberately concealed for several months the fact that plaintiff had been fired, as opposed to laid off.

In this case, it is undisputed that plaintiff was informed of her termination on September 26, 2007, that she believed on that date that her last day at SPAN would be October 4, 2007, and that her last day of work was, in fact, October 4, 2007.  Accordingly, the statute of limitations began to run on September 26, 2007.  *See Almond*, 665 F.3d at 1176.  However, plaintiff has produced evidence that Ms. Tapp told the staff on September 27, 2007 that plaintiff was not being terminated and that Lisa Calderon informed plaintiff about this statement.  Docket No. 122-5 at 18 (Calderon dep., at 343, ll.7-13).  A reasonable jury could find that Ms. Tapp not only made this statement, but that it constituted an action that Ms. Tapp should "unmistakably have understood would cause the employee to delay filing [her] charge," *see Hulsey*, 43 F.3d at 557, and thus that the statute of limitations was tolled for the eight days between Ms. Tapp's statement and plaintiff's termination.

As plaintiff has raised a genuine dispute of material fact as to whether defendants "lulled [her] into inaction" by announcing that she was not being terminated, *see Montoya*, 296 F.3d at 957, summary judgment is not warranted on the basis that her claims are time-barred.

### B.  Discriminatory Termination

Plaintiff alleges that defendants violated 42 U.S.C. § 1981 by terminating her on the basis of her race and national origin.[2]  Docket No. 133 at 2, ¶ 3(a).

Section 1981 accords "[a]ll persons within the jurisdiction of the United States . . . the same right in every State and Territory to make and enforce contracts," which includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(a), (b).  It is well established that § 1981 "affords a federal remedy against discrimination in private employment on the basis of race." *Johnson v. Railway Exp. Agency, Inc.*, 421 U.S. 454, 459-60 (1975).

Courts apply the *McDonnell Douglas* burden-shifting framework to employment discrimination claims under 42 U.S.C. § 1981.  *See Barlow v. C.R. England, Inc.*, 703 F.3d 497, 504-05 (10th Cir. 2012).  At step one of the *McDonnell Douglas* inquiry, a plaintiff must establish a prima facie case by showing that (1) she was a member of a protected class; (2) she was qualified for her job and performing satisfactorily; (3) she

_____

[2] The Court notes that, although section § 1981 does not protect individuals on the basis of national origin, it does "protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics."  *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987). Here, plaintiff brings a single claim for discrimination on the basis of a racial category that encompasses her national origin, which is clearly covered by § 1981.

was discharged despite her qualifications; and (4) there is some additional evidence giving rise to an inference of discrimination, for example, that the position was not eliminated after her termination. *Kendrick v. Penske Transp. Servs. Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000) (citing *Perry v. Woodward*, 199 F.3d 1126, 1138 (10th Cir. 1999); *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004). If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant employer to state a legitimate, nondiscriminatory reason for its adverse employment action. *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1321 (10th Cir. 2004). If the defendant produces a legitimate reason, then the court must grant the defendant summary judgment, unless the plaintiff can show a genuine issue of material fact as to whether the stated reason for the adverse action is pretextual. *Id*.

### 1. *Prima Facie Case*

A plaintiff has established a prima facie case if the undisputed facts, viewed in the light most favorable to the plaintiff, would allow a reasonable jury to draw an inference of discrimination. *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002). An inference of discrimination arises where there is a "logical connection" between each element of the prima facie case and the alleged discrimination. *Kendrick*, 220 F.3d at 1227.

In *Smith v. Okla. ex rel. Tulsa Cnty. Dist. Attorney*, 245 F. App'x 807, 812 (10th Cir. 2007), the Tenth Circuit found that plaintiff's "five-year tenure as an investigator, her own assessment of her performance, and the fact that the District Attorney's Office did not formally reprimand, suspend, or discharge her for the alleged performance

deficiencies until budget concerns arose . . . could all support her contention that she was performing her job adequately."  The court further found that plaintiff's testimony that she was deprived job counseling and other opportunities to improve that were offered to male investigators was sufficient to raise an inference of discrimination.  *Id.*; *see also MacDonald v. E. Wy. Mental Health Ctr.*, 941 F.2d 1115, 1121 (10th Cir. 1991) (plaintiff may establish prima facie case of discriminatory termination by "credible evidence that she continued to possess the objective qualifications she held when she was hired, . . . or by her own testimony that her work was satisfactory, even when disputed by her employer, . . . or by evidence that she had held her position for a significant period of time"), *abrogated on other grounds by Randle v. City of Aurora*, 69 F.3d 441 (10th Cir. 1995).

There is no dispute in this case that plaintiff, as a Mexican-American, is a member of a protected class.  Docket No. 108 at 21; Docket No. 122 at 23-24.  Nor is there any dispute that she was terminated from her employment at SPAN.  Docket No. 108 at 13, ¶ 52; Docket No. 122 at 16, ¶ 52.  However, defendants argue that plaintiff cannot establish a prima facie case because she cannot show that she was treated differently than similarly situated employees who are not Mexican-American.  Docket No. 108 at 21.  They further argue that there are no truly relevant comparators because no other employees acted in the same confrontational manner as plaintiff.  Docket No. 108 at 21-22.

However, evidence that plaintiff was treated differently than similarly situated employees outside of her protected class is not necessary to this inquiry.  *See Kendrick*, 220 F.3d at 1229 ("comparison to a person outside of the protected class in

the fourth prong of the prima facie case is unnecessary to create an inference of discriminatory discharge").  As in *Smith*, plaintiff's seven-year tenure as a SPAN employee, marked by increasing responsibility over time; the absence of formal negative evaluations or corrective actions; and the testimony of plaintiff and her supervisor that she was a competent employee could support a finding that she was performing her job satisfactorily.  *See Smith*, 245 F. App'x at 812.

Moreover, there is evidence that the 2005 program audit was used as a basis for terminating plaintiff but did not motivate prompt disciplinary or corrective action against two similarly situated white employees whose programs received the same type of criticism.  *See* Docket No. 122-6 at 16, 18 (Tapp dep., at 182, l.15-183, l.21, 189, l.5-190, l.1).  Defendants' assertion that the white employees improved their performance following the audit, while plaintiff did not, does not undermine plaintiff's prima facie case, but rather constitutes a controverted factual matter between the parties.  Docket No. 126 at 3, ¶ 25 (citing Docket No. 126-2, Tapp Affidavit, at 2, ¶ 2).

Finally, plaintiff offers evidence that two former SPAN employees, Lisa Calderon and Ms. Arredondo, found that SPAN directors participated in creating racial tension within the organization.  Docket No. 108-24 at 4 ("As the sole African-American woman on staff, and the only one to last more than a year at SPAN, I have endured targeting and stereotyping throughout my entire tenure."); Docket No. 122-8 at 9 (Arredondo dep., at 85, ll.2-10) ("women of color and immigrant women were being pitted against each other in relationship to their cooperation with SPAN's new direction in anti-racism work").  Ms. Arredondo submitted an affidavit in which she described Ms. Tapp's "frequent pattern of discrediting women of color with whom she disagreed" and referred

15

to the "rapidly escalating hostile work environment" at SPAN.  Docket No. 122-19 at 9, ¶¶ 22-23.

Taken together and viewed in the light most favorable to plaintiff, these facts would permit a reasonable jury to infer that plaintiff's termination was discriminatory. *See Hysten*, 296 F.3d at 1181.  Thus, plaintiff has carried her burden of setting forth a prima facie case.

### 2.  Legitimate Non-Discriminatory Reason

Defendants have stated a legitimate, non-discriminatory reason for terminating plaintiff, namely, that plaintiff's work performance was poor and her manner toward other staff members was confrontational and disrespectful.  Docket No. 108 at 22. Specifically, defendants state that after SPAN changed the direction of its anti-racism work, plaintiff became aggressive and confrontational, refused to conduct a scheduled volunteer training session, made homophobic comments to gay employees, stopped conducting group sessions for women living in the SPAN shelter, stopped entering case notes in the system, stopped returning client phone calls, and began actively looking for a new job.  Docket No. 108 at 22.  Plaintiff does not dispute that poor performance is grounds for termination.  Docket No. 122 at 25-28.  Thus, summary judgment is warranted unless plaintiff can show that there is a triable issue of material fact as to whether defendants' stated reason is pretextual.  *Sandoval*, 388 F.3d at 1321.

### 3.  Pretext

A plaintiff may show pretext by demonstrating that there are "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in an employer's

stated reason such that "a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996) (internal quotation marks omitted). "A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005) (internal citation and alterations omitted).

The court's role is to prevent and redress employment discrimination and not to act as a "'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006); (quoting *Jones v. Barnhart,* 349 F.3d 1260, 1267 (10th Cir. 2004)); *see also McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) ("An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment.").

Plaintiff argues that the record does not support defendants' characterization of her performance and instead gives rise to an inference of pretext. Docket No. 122 at 25-28. With respect to her overall performance at work, plaintiff offers the deposition testimony of Ms. Arredondo, plaintiff's direct supervisor from summer 2006 through her termination in October 2007. Ms. Arredondo testified that plaintiff "was very meticulous in taking down notes and information about clients, case management, any issues that were going on in the shelter," interacted and empathized with clients in a friendly

17

manner, was responsive to client needs, communicated well with the shelter team, supported her peers, and adapted flexibly to changes.  Docket No. 122-8 at 14-15 (Arredondo dep., at 136, l.23-140, l.25).  Ms. Arredondo testified that plaintiff had difficulties with computer data entry.  *Id*. at 141, ll.1-10.  Ms. Arredondo denied that plaintiff's performance declined following SPAN's change in direction or Lisa Calderon's departure.  Docket No. 122-9 at 11 (Arredondo dep., at 322, ll.2-18).  Ms. Arredondo stated that, in fall 2007, she told Ms. Tapp that she did not share Ms. Rooney's concerns regarding plaintiff's performance and that she was uncomfortable documenting issues she had not observed.  Docket No. 122-8 at 35 (Arredondo dep., at 246, ll.2-13).  Ms. Arredondo stated that she received feedback from clients expressing frustration about plaintiff, but that often such frustration was related to a decision that Ms. Arredondo had made and plaintiff had only communicated to the client.  Docket No. 122-8 at 19 (Arredondo dep., at 159, l.7-160, l.20).

Dolores Andrade-Mejias, who worked at SPAN from 2001 through 2009 and worked with plaintiff at the shelter, stated that plaintiff was a "[h]ard worker. . . . She was always on time, staying late."  Docket No. 122-10 at 6 (Andrade-Mejias dep., at 43, ll.2-3); Docket No. 108-52 at 3 (Andrade-Mejias dep., at 29, ll.6-10).  Ms. Andrade-Mejias further stated that plaintiff was "well liked by the staff and the clients" who felt it was "very easy to talk to her" and that she did not have weaknesses as an employee. Docket No. 122-10 at 6 (Andrade-Mejias dep., at 43, ll.7-19).  Susana Avelar-Recinos, who worked with plaintiff between 2002 and 2008, stated that plaintiff was "sweet" and that Ms. Avelar-Recinos worked well with plaintiff.  Docket No. 122-11 at 5-6 (Avelar-Recinos dep., at 57, ll.3-25, 62, ll.1-10); Docket No. 108-53 at 3 (Avelar-Recinos dep.,

18

at 40, l.24-41, l.3).   Angela Hardin, who worked with plaintiff in 2002, stated that plaintiff

"kept the most thorough, detailed" notes, was "very calm during conflict or crisis," and

was "good at explaining" crisis situations to other staff members and clients.   Docket

No. 122-12 at 4 (Hardin dep., at 38, ll.13-18, 39, ll.3-11).   Ms. Hardin did not recall any

weaknesses in plaintiff's job performance.   *Id*. at 39, ll.15-16.   In response to an email

from Lisa Calderon alerting her to this lawsuit, Debbie Ramirez, a former SPAN

employee, wrote:

> Elaine has always been extremely supportive to me.  As a [woman] of color
> her words always resonated with me and helped me develop my critical
> thinking skills.  Her [shelter] intakes were always thorough.  When she was
> on call I was confident that women would be attempted to be reached and
> if they were available all services would be reviewed and questions
> answered.  In addition we brainstormed together on the Leadership Council.
> She has also been a powerful positive influence on my life.

Docket No. 122-16 at 6.   Testimony from Ms. Arredondo, Ms. Andrade-Mejias, Ms.

Avelar-Recinos, and Ms. Hardin as to plaintiff's overall competence and success in her

role at SPAN could permit a reasonable jury to infer that defendants' characterization of

plaintiff's work performance is implausible.   *See Morgan*, 108 F.3d at 1323.

Plaintiff testified that she was unclear about her role in the June 2007 volunteer

training and that Ms. Arredondo told her she did not have to participate.   Docket No.

122-5 at 18 (Calderon dep., at 341, l.9-342, l.13).   With respect to this training session,

Ms. Arredondo testified that "there was some issue about Elaine participating in other

components of training and trying to confirm, you know, for different staff which parts

that they would be facilitating" and that she did not recall any of the conversations

regarding this event that defendants cited.   Docket No. 122-9 at 12 (Arredondo dep., at

330, l.25-331, l.15).

19

Although plaintiff admitted that she was looking for a job, she states that she nonetheless told Ms. Arredondo that she did not want to leave SPAN and that Ms. Arredondo relayed this message to Ms. Tapp, as described in notes of meetings between Ms. Arredondo and Ms. Tapp.  *See* Docket No. 108-37 at 2 (notes compiled by Ms. Tapp stating that on September 11, 2007, Ms. Arredondo met with plaintiff, who stated that she was not resigning); Docket No. 108-39 at 2 (notes compiled by Ms. Arredondo on October 5, 2007, stating that on September 13, 2007, she informed Ms. Tapp that plaintiff stated she was not quitting).

Ms. Tapp admitted that, aside from a 2003 unsigned performance evaluation and work plan, Docket Nos. 108-10 and 108-11, plaintiff did not receive any verbal warnings, disciplinary write-ups, or corrective actions from 2002 through 2006.  Docket No. 122-6 at 14 (Tapp dep., at 173, ll.5-23).  Defendants claim that plaintiff's personnel file disappeared in late September 2007, but do not state that the file contained documentation of plaintiff's performance problems.  *See* Docket No. 108-12 at 2.  The absence of evidence that defendants took any action in response to years of alleged performance problems could lead a reasonable jury to infer that defendants' stated reason for plaintiff's termination is not plausible.  *See Plotke*, 405 F.3d at 1103.

Finally, defendants argue that Ms. Tapp is entitled to the "same actor inference" because she was responsible for hiring, as well as terminating, plaintiff.  *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006).  Plaintiff disputes that Ms. Tapp hired or promoted plaintiff, but admits that only Ms. Tapp had the authority to hire her.  Docket No. 108 at 2, ¶ 2; Docket No. 122 at 3, ¶¶ 2-4, 10, 11, 13.  Although the facts here would permit the jury to infer that Ms. Tapp is not liable on the asserted

20

claims, this is not a mandatory inference "and it may be weakened by other evidence." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573 (6th Cir. 2003).  This inference is not sufficient "to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact."  *Id*. at 573-74; *see also Antonio*, 458 F.3d at 1183 ("'same actor' evidence gives rise to an inference, rather than a presumption, that no discriminatory animus motivated the employer's actions") (citing *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1443 (11th Cir. 1998) ("this inference is a permissible–not a mandatory–inference that a jury may make in deciding whether intentional discrimination motivated the employer's conduct")).

Plaintiff has produced evidence that she was not having persistent problems with her attitude or job performance, that she did not want to resign her position at SPAN, and that she did not refuse to conduct the June 2007 training session.  She has also pointed out that defendants have produced only minimal documentation of her allegedly ongoing performance issues and their responses to it.  This evidence is sufficient to raise a genuine dispute of material fact as to the accuracy of defendants' stated reason for her termination and thus sufficient to give rise to an inference that the stated reason is pretextual.  *See Plotke*, 405 F.3d at 1102.

### C.  Retaliation

A plaintiff bringing a retaliation claim under § 1981 "must establish that retaliation played a part in the employment decision."  *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) ("the showing required to establish retaliation is identical under § 1981 and Title VII of the Civil Rights Act") (internal citations omitted).  A plaintiff

may rely on the *McDonnell-Douglas* framework to prove indirectly that retaliatory animus played a motivating role in an adverse employment decision, in which case plaintiff must first establish a prima facie case by showing that (1) she engaged in protected opposition to discrimination; (2) she suffered an employment action that a reasonable employee would find materially adverse; and (3) a causal connection existed between the protected activity and the adverse action.  *Id*.  If plaintiff can establish a prima facie case, the burden shifts to defendants to provide a legitimate reason for their decision and, if they succeed, shifts back to plaintiff to show that the proffered reason is pretextual.  *Id*.

### 1.  Protected Opposition to Discrimination

Opposition to an employer's conduct is protected only if the challenged conduct is unlawful under § 1981.  *See Petersen v. Utah Dep't of Corrs.*, 301 F.3d 1182, 1188 (10th Cir. 2002).  An employee must show that the employer was aware of the protected activity prior to taking the adverse action.  *Id*.  However, an employee need not be correct that the employer has in fact violated § 1981; a good faith belief that such a violation has occurred is sufficient.  *Id*.

Plaintiff testified at her deposition that she raised the issue of Lisa Calderon's departure from SPAN at several staff meetings beginning in spring 2007 and continuing through August 2007.  Docket No. 122-5 at 21 (Calderon dep., at 353, ll.7-20). Specifically, plaintiff testified that:

> I was questioning why Lisa C.–Lisa Calderon was discriminated against, and bringing that up, I believe, is why I was starting–began to get the directives from Yolanda to be quiet, and yet I believe there was other people that wanted to know the same, why Lisa Calderon was being discriminated

against.

Docket No. 122-5 at 18 (Calderon dep., at 340, ll.5-11).  Plaintiff stated that she also

raised the issue of discrimination against Lisa Calderon in Leadership Counsel

meetings and Women of Color Caucus meetings.  Docket No. 122-5 at 22-23 (Calderon

dep., at 359, l.3-360, l.3).  Plaintiff explained that she developed a belief in the spring of

2007, based on Lisa Calderon's resignation letter, that Lisa had been subject to a

hostile work environment while at SPAN on the basis of race.  Docket No. 122-5 at 20

(Calderon dep., at 350, ll.2-6) ("it came to light . . . after I read her resignation letter how

intense it was and what a hostile environment she was in, which, to me, as a woman of

color, is discriminatory").  Ms. Arredondo testified that plaintiff told her at the time of

Lisa Calderon's resignation that "she felt Lisa C. had been forced out of the

organization, and that she felt that was the result of Anne's–Anne Tapp's behavior."

Docket No. 122-8 at 27 (Arredondo dep., at 214, l.21-215, l.2).

In her resignation letter, dated June 25, 2007, Lisa Calderon stated that she was

resigning "[d]ue to a hostile work environment created by my supervisor, the Executive

Director, Anne Tapp"; that she was treated differently than a particular similarly situated

white female director, who was given the opportunity to transition out of SPAN on her

own timeline; that, "[a]s a Black woman who has come to expect being saddled with

additional expectations and responsibilities, I stepped up repeatedly to fill the void, and

then inevitably was resented for it"; that, "[a]s the sole African-American woman on

staff, and the only one to last more than a year at SPAN, I have endured targeting and

stereotyping throughout my entire tenure"; and that the "angry, scary and

unapproachable Black woman stereotype was a racist element woven into the

23

organizational fabric from the time I arrived at SPAN over a decade ago and persists."
Docket No. 108-24 at 2-4.

As Lisa Calderon's resignation letter describes a racially hostile environment
within SPAN and discusses Ms. Tapp's role in contributing to that environment, the
resignation letter could form the basis for a good faith belief on the part of plaintiff that,
prior to her departure, Lisa Calderon was subject to a hostile work environment on the
basis of race and that this hostility effectively forced her out of the organization.
Subjecting an employee to a hostile work environment on the basis of race is a violation
of § 1981.  *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004).  The
testimony of plaintiff and Ms. Arredondo that plaintiff raised this issue in staff meetings
supports an inference that Ms. Tapp and the other directors were aware of plaintiff's
protected activity.  Accordingly, plaintiff has raised a genuine dispute of material fact
regarding whether she engaged in protected opposition to discrimination.

### 2.  Adverse Action

There is no dispute that plaintiff suffered an adverse action when she was
terminated from SPAN.  Docket No. 108 at 28-29.

### 3.  Causal Connection

"A causal connection may be shown by evidence of circumstances that justify an
inference of retaliatory motive, such as protected conduct closely followed by adverse
action."  *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001).  Absent
additional evidence of causation, very close temporal proximity is required.  *Id.*  For
example, a one and one-half month gap may be sufficient on its own to establish

causation, while a delay of three months is not. *Id*. (citing *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) and *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

Plaintiff testified that she voiced concerns regarding discrimination against Lisa Calderon during staff meetings starting in late spring 2007. Lisa Calderon's resignation letter indicates that she left SPAN at the end of June 2007. Docket No. 108-24 at 5. It is undisputed that Ms. Tapp, Ms. Arredondo, and plaintiff discussed how and under what circumstances plaintiff would leave SPAN in early September, if not before then. Docket No. 122 at 14, ¶ 48; Docket No. 126 at 7, ¶ 48-53; *see also* Docket No. 108-39 at 5. A factfinder could conclude based on this evidence that Ms. Tapp began to push for plaintiff's termination no more than two months after plaintiff began to voice concerns about a hostile environment at meetings. The temporal proximity between these two events is sufficient to "justify an inference of retaliatory motive." *O'Neal*, 237 F.3d at 1253; *see also Anderson*, 181 F.3d at 1179.

#### 4. *Legitimate Non-Discriminatory Reason and Pretext*

The remainder of the analysis regarding defendants' legitimate non-discriminatory reason and the question of pretext is identical to that described above with respect to plaintiff's discriminatory termination claim and leads to the same result: plaintiff's claim for retaliatory termination in violation of § 1981 survives summary judgment.

## IV. CONCLUSION

Since both of plaintiff's claims survive defendants' motion for summary judgment,

it is not necessary to resolve plaintiff's motions to strike several of defendants' exhibits and arguments or to file a surreply.  Accordingly, it is

**ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 108] filed by defendants Safehouse Progressive Alliance for Nonviolence and Anne Tapp is DENIED.  It is further

**ORDERED** that Plaintiff's Motion to Strike Exhibits to Defendants' Motion for Summary Judgment (Dkt. # 108) [Docket No. 123] filed by plaintiff Elaine Calderon is DENIED as moot.  It is further

**ORDERED** that Plaintiff's Motion to File Sur-Reply Regarding Defendants' Motion for Summary Judgment (Dkt. No. 108) [Docket No. 129] filed by plaintiff Elaine Calderon is DENIED as moot.  It is further

**ORDERED** that Plaintiff's Motion to Strike Exhibit to Defendants' Reply Regarding Motion for Summary Judgment (Dkt. # 126) or, in the Alternative, to Allow Discovery Regarding the Affidavit [Docket No. 130] filed by plaintiff Elaine Calderon is DENIED as moot.  It is further

**ORDERED** that Plaintiff's Motion to Strike Immaterial and Scandulous [sic] Material in Defendants' Reply Brief [Dkt.#126] [Docket No. 138] filed by plaintiff Elaine Calderon is DENIED as moot.

DATED May 17, 2013.

BY THE COURT:

 s/Philip A. Brimmer                                    
PHILIP A. BRIMMER
United States District Judge

26